# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOEUN TIM, | § |
| | § |
|     *Plaintiff*, | § |
| | § |
| *versus* | §    CIVIL ACTION NO. 6:12-1761 |
| | § |
| CAROLYN W. COLVIN, | § |
| Acting Commissioner of | § |
| Social Security, | § |
| | § |
|     *Defendant*. | § |

## REPORT AND RECOMMENDATION

Hoeun Tim ("Tim") seeks review of an adverse decision on her applications for disability-based benefits under the Social Security Act.

### I. Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Within the penumbra of this narrow authority, however, courts make threshold determinations as to whether claimants received full hearings in accordance with the beneficent purposes of the Social Security Act. Thus, before district courts evaluate the Commissioner's findings and conclusions, they first ensure that claimants received full and fair hearings. *See Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *accord Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990). This involves searching investigations

of administrative records to ensure that administrative law judges protected claimants' rights. *See Robinson v. Secretary of Health & Human Servs.*, 733 F.2d 255, 258 (2d Cir. 1984).

Courts also must take "due account" of "the rule of prejudicial error" when reviewing acts of administrative agencies. 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights"). Thus, judicial review is deferential to the Commissioner's presumed expertise.

## II.  Background

Tim is a mentally-ill Cambodian immigrant with multiple physical ailments. She applied for disability-based social security benefits due to depression, anxiety, severe mood swing, loss of self control, difficulty being around other people, right shoulder arthritis, neck cracking with tingling sensation, diabetes, nausea, dizziness and severe allergies. (T. 267, 269, 292).[1] Administrative law judge, Marie Greener ("ALJ Greener"), denied Tim's applications. (T. 163-174). The Appeals Council declined review; Tim then instituted this proceeding.

## III.  Commissioner's Decision

Utilizing a five-step sequential evaluation procedure prescribed by regulation,[2] ALJ Greener found that some of Tim's maladies (*i.e.*, fibromyalgia,

---

 ¹    "T." followed by a number refers to the page of the administrative record.  (Dkt. No. 8).

 ²    The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered.  *See* 20 C.F.R. §§ 404.1520, 416.920.

cervalgia, post-traumatic stress disorder (PTSD), and depression) are "severe impairments" within the Commissioner's concept of that term (*i.e.*, medically determinable abnormalities producing more than minimal functional limitations).³ She determined, however, that none, whether considered singly or in combination with all other impairments, is of such severity as to meet or medically equal the Commissioner's listing of presumptively disabling impairments.⁴ (T. 166-68).

ALJ Greener next found that while Tim's impairments significantly reduce her capacity to perform normal work activities, she retains "residual functional capacity" for "less than a full range of light work."⁵ (T. 168). ALJ Greener reasoned that Tim's physical abilities permit her to perform work at the light exertional level, but her mental limitations require that she work only in

---

³     *See* 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also Meadors v. Astrue*, 370 Fed. App'x 179, 182 (2d Cir. 2010).

⁴     The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). Listed impairments are presumptively disabling. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii).

⁵     ALJ Greener's complete "residual functional capacity" finding was:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and/or carry 25 pounds occasionally, ten pounds frequently, sit for six hours in an eight-hour day, and stand and/or walk for six hours in an eight hour day. The claimant has no postural, manipulative, communicative, visual, or environmental limitations. Due to her mental impairments, the claimant is limited to routine work that does not change in pace or location on a daily basis and is unskilled or semi-skilled. She retains the ability to (on a sustained basis) understand, carry out, and remember simple and complex instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. This is consistent with the ability to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

(T. 168).

routine unskilled or semi-skilled jobs that do not change in pace or location on a daily basis. *Id.*

Tim previously engaged in substantial gainful employment as a thermostat assembler and electronic circuit board solderer. ALJ Greener consulted the *Dictionary of Occupational Titles*, with respect to these jobs, and determined that requirements for such work do not exceed Tim's residual functional capacity.[6] Thus, at Step 4 of the sequential evaluation, ALJ Greener found that Tim can still perform her past relevant work as those jobs actually and generally are performed. (T. 172-73).

When sequential evaluation results in a Step 4 determination that a claimant can still perform past relevant work, further inquiry normally ends, and an application for disability-based benefits is denied.[7] ALJ Greener, however, proceeded to Step 5 to determine whether a person similarly situated to Tim can perform other available work. (T. 173-74). There, she consulted Medical–Vocational Guidelines commonly referred to as "the grids."[8] Using them "as a framework for decisionmaking," she concluded that Rule 202.18 therein makes appropriate a finding of "not disabled." (*Id.*).

---

[6] According to the Dictionary of Occupational Titles, thermostat assembler (DOT Code 710.684-046 and 692.685-218)and circuit board solder (DOT 726.685-050)are light exertional and semi-skilled positions.

[7] 20 C.F.R. §§ 404.1520(a)(4) (iv), 416.920(a)(4)(iv); *see also Cichocki v. Astrue*, 534 Fed. App'x 71, 74 (2d Cir. 2013) (summary order).

[8] The Medical Vocational Guidelines are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. They "take into account a claimant's RFC, as well as her age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n. 1 (2d Cir. 2009) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996) (citing 20 C.F.R. § 404.1567(a)).

Under both the Step 4 and Step 5 findings, a conclusion of "not disabled" was reached. (T. 172-74). Consequently, Tim's applications were denied.

## IV. Points of Alleged Error

Tim's brief to the court proffers seven alleged errors:

I. The ALJ erred in only giving little weight, not controlling weight, to the RFC opinion of Plaintiff's treating psychiatrist, instead giving greater weight to the non-examining state agency psychologist.

II. The ALJ erred in improperly substituting his own opinion that Plaintiff had the physical RFC for light work, which was nowhere supported by medical evidence in the record;

III. The ALJ erred in failing to find Plaintiff has a medically determinable severe impairment of migraines/cervicogenic headaches, and failed to fully develop the record as to the disabling nature of the headaches, requiring remand;

IV. The ALJ erred n failing to set forth specific findings supporting his opinion that Plaintiff was capable of light work;

V. The ALJ erred in failing to set forth required finding to substantiate his rejection of Plaintiff's testimony as to pain and limitations as not credible;

VI. The ALJ erred in finding Plaintiff could perform her prior job, and otherwise has the RFC for less than a full range of light work, without seeking the opinion of a vocational expert; and

VII. The ALJ erred in failing to properly evaluate Plaintiff's medically diagnosed fibromyalgia/myofascial syndrome, requiring remand.

(Dkt. No. 12, pp. i-ii).

In response to each point, the Commissioner's brief argues that ALJ Greener employed correct legal principles and that her factual findings are supported by substantial evidence.[9] (Dkt. No. 14, pp. 5-17).

## V. Discussion and Analysis: Point I

This point argues that ALJ Greener erred when assessing credibility of medical opinions relating to mental limitations. Although not expressed *in haec verba*, the implicit thrust is that credibility-assessment errors resulted in an inflated and invalid residual functional capacity determination. Since both ALJ Greener's Step 4 finding (ability to perform past relevant work) and her Step 5 finding (ability to perform alternative work) are predicated thereon, Tim argues that neither can survive judicial review.

To pass judgment on this argument, a reviewing court must first piece together the medical opinion evidence and ascertain how ALJ Greener weighed it. Next, the court must identify legal principles governing medical opinion credibility determinations, and finally apply them to Tim's challenges to ALJ Greener's credibility choices.

*A.    Medical Opinions Regarding Mental Limitations*

ALJ Greener received and considered medical opinions regarding Tim's mental limitations from four sources:

| Name | Role |
|---|---|
| Dr. Jayaratu Raju, M.D. | Treating Psychiatrist |
| Dr. Jamal Emad, M.D. | State Agency Psychiatric Examining Physician |

---

[9]    Under this district's practice, the parties marshal their arguments through competing briefs. *See* General Order #18, September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

| Name | Role |
|---|---|
| George Alexis Sirotenko, D.O. | Neurological Consulting Examining Physician |
| J. Dombrocia[10] | Non-examining State Agency Psychological Consultant |

The treating psychiatrist, Dr. Raju, on staff at Community Health and Behavioral Services ("CHBS"), a division of Upstate Cerebral Palsy, began treating Tim for major depressive disorder and PTSD in November 2009. (T. 458). He continued treating her regularly until at least February 2012. (T. 142). Dr. Raju submitted a social security "Medical Source Statement of Ability to do Work-Related Activities (Mental)" regarding Tim's mental functional limitations. He opined that since September 29, 2009, Tim suffers from *marked limitations* in her ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to usual work situations and to changes in a routine work setting. (T. 603). The term "marked" indicates "[t]here is a serious limitation in this area. There is a substantial loss in the ability to effectively function." (T. 602-03).[11]

Dr. Emad served as a consulting psychiatric examining physician. After examining Tim and reviewing her chilling history of mental pain and treatment

---

[10] The record before the court does not reflect J. Dombrocia's credentials; instead, it merely provides "J. Dombrocia, psychology." (T. 515). Because ALJ Greener refers to this individual as a "psychological consultant" who submitted "medical opinion" (T. 171-72), the undersigned assumes that he or she carries a professional license in the mental health field.

[11] Dr. Raju also opined that Tim has *mild* limitations in her ability to: understand, remember, and carry out simple instructions, and *moderate* limitations in her ability to: understand, remember, and carry out complex instructions as well as make judgments on complex, work-related decisions. (T. 602).

thereof,[12] he diagnosed Tim with PTSD and *delusional disorder*. (T. 513). Dr. Emad recommended that Tim "continue receiving intensive psychiatric outpatient treatment." (T. 514). He reported that she is "overly suspicious of others, resulting in being withdrawn from people and stays to herself often. She needs to continue with psychiatric outpatient treatment and continue with her present medication. Her prognosis is guarded to poor." (*Id.*).

Consulting osteopath, Dr. Sirotenko, examined Tim from a neurological standpoint, primarily with respect to complaints of headaches. (T. 453). His report also contained a section titled "mini mental status." (T. 454). There, Dr. Sirotenko observed that Tim was appropriately dressed, maintained good eye contact, and was oriented to time, person, and place. (*Id.*). She showed *no evidence of delusions, or hallucinations and no evidence or recent or remote memory impairment*. (*Id.*) (emphasis added). Her mood and affect were appropriate; her insight and judgment were intact. (*Id.*). He opined that there is *no evidence of any psychiatric impairment*. (*Id.*) (emphasis added).

Consulting and non-examining J. Dombrocia, reviewed Tim's psychological treatment records for the State Agency.[13] Dombrocia submitted a "Mental Residual Functional Capacity Assessment" dated after Dr. Emad's

---

[12] Tim advised Dr. Emad the reason for her treatment at CHBS:

```
She tried to kill herself with a knife 8 months ago. * * * She describes
having nightmares.  She said that during the war in 1976, Khmer Rouge took
her together with her mother.  She tried together with her mother to escape
but they caught her, took her to the jungle, and killed her mother when the
claimant was about 6 years old.  After killing her mother, some she escaped
inn to the woods or jungle, there facing wild animals.  She claims that her
mother was beat up and killed.  At that time she said she saw many dead
bodies, but at the age of 6, she thought they were asleep; she did not know
they were dead.  She said she has bad dreams mostly at night and they are
very disturbing.  She wakes up with a cold sweat.  The next day she cannot
function.
```

(T. 512).

[13] New York State Office of Temporary and Disability Assistance, Division of Disability Determinations.

report but before Dr. Raju's medical source statement. Dombrocia opined that, out of 20 mental function activities, Tim is *not significantly limited* in 16, but is *moderately* limited in 4 including: (1) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) ability to interact appropriately with the general public; and (4) ability to respond appropriately to changes in the work setting. (T. 529-30). Dombrocia further opined that Tim would benefit from a "low contact setting" without amplifying what that means. (T. 531).

B.   *ALJ Greener's Weighting of Medical Opinions*

ALJ Greener gave treating psychiatrist Dr. Raju's opinions only "*little evidentiary weight*," stating that the marked limitations suggested by him were not supported by his clinical findings. (T. 171). Similarly, ALJ Greener gave opinions of State Agency psychiatric examiner Dr. J Emad, M.D. "*little evidentiary value*," because Dr. Emad did not "provide an opinion regarding the claimant's limitations." (T. 171). ALJ Greener also stated that Dr. Emad's "findings reflect . . . reports of hallucinations and delusions that are not corroborated by the claimant's mental health records." (T. 171).

ALJ Greener elected, instead, to give "*some weight*" to opinions of State Agency psychological consultant, J. Dombrocia. (T. 172). She did not identify which of Dombrocia's opinions she credited or indicate whether "some" means little or a lot. She stated only that Dombrocia proffered a "medical opinion . . . supported by the mental status examinations in the record." (T. 172).

ALJ Greener did not state that she gave any weight to opinions of neurological consultative examiner Dr. Sirotenko with respect Tim's mental limitations. ALJ Greener relied on Dr. Sirotenko's "mini mental status" report, however, when finding Tim's subjective testimony not credible. ALJ Greener points to Dr. Sirotenko's benign observations as impugning Tim's allegations of severe psychiatric symptoms. (T. 169).

C.  *Challenge to Medical Opinion Credibility Choices*

Tim argues that ALJ Greener erred when failing to afford controlling weight to Dr. Raju's opinions regarding her mental limitations because he is her treating physician. Tim contends that ALJ Greener's reasons for not following the treating physician rule are demonstrably inaccurate, and constitute impermissible cherry-picking of evidence favorable for denying disability while disregarding conflicting evidence that supports Tim's claim for disability. (Dkt. No. 12, pp. 14-18).

Alternatively, Tim argues that even if Dr. Raju's opinions were not afforded controlling weight, ALJ Greener erred by not deciding how much weight to give his opinions in accordance with an evaluative protocol established in the Commissioner's regulation. Tim implicitly argues that under a six-factor analysis required by that protocol, Dr. Raju's opinions regarding mental limitations would be entitled to more weight than any other medical opinion in the record.

D.  *Governing Legal Principles*

Administrative law judges must give controlling weight to opinions of "treating sources"[14] regarding the nature and severity of impairments, provided they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record.[15] The reason for this "treating physician rule" is both obvious and sound. The Commissioner expresses it well in her regulation:

> [T]reating sources . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Nevertheless, when treating source opinion swims upstream, contradicting other substantial evidence, such as opinions of other medical experts, it may not be entitled to controlling weight. *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643–44 (2d Cir. 2007) (summary order); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). Likewise, a treating physician's opinion may be discounted when it is internally inconsistent. *See Micheli v. Astrue*, 501 Fed. App'x 26, 28 (2d Cir. 2012) (summary order).

When controlling weight is not afforded to treating source opinion with respect to severity of impairments and how they affect individuals' ability to function, the degree of weight to be given such evidence is determined by

---

[14]  *See* 20 C.F.R. §§ 404.1502, 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

[15]  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

applying certain generic factors prescribed by regulation: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) evidence supporting the opinion; (4) how consistent opinion is with record as a whole; (5) specialization in contrast to condition being treated; and (6) other significant factors.[16]

In either event, *i.e.*, whether treating source opinion is afforded controlling weight or some lesser degree, an administrative law judge must always give good reasons for the weight given to a claimant's treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). To be "good," those reasons must be supported by the evidence in the case record, and sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to a treating source's medical opinion and the reasons for that weight. SSR 96-2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *5 (S.S.A. July 2, 1996). This requirement is designed to assist a court's review of the Commissioner's decision and to let claimants understand dispositions of their cases. *Smith v. Colvin*, No. 11–CV–4802 (NGG), 2013 WL 6504789, at *9 (E.D.N.Y. Dec. 11, 2013) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)).

E.  *Application and Discussion*

   1.  <u>Disregard of Treating Physician Rule</u>

Dr. Raju is a medical doctor and board-certified specialist in the mental health field of psychiatry. The length, nature and extent of his treatment relationship with Tim, and the frequency with which he examined Tim unequivocally place him into the category of a treating medical source. As such,

---

[16] *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

his opinions regarding limitations stemming from Tim's mental impairments presumptively are entitled to controlling weight under the "treating physician rule" described in the preceding section.

Dr. Raju's opinions could be wholly or substantially rejected only for good reason. Here, the sole reason ALJ Greener gave for affording Dr. Raju's opinions little evidentiary weight was that the marked mental limitations suggested by him in certain functional areas were not supported by his clinical findings. (T. 171). ALJ Greener came to this conclusion on the basis of two discrete instances in Dr. Raju's treatment notes. The first, a May 9, 2011,[17] visit with CHBS therapist Nancy Deangelis, resulted in *her* observation that Tim's mood and affect were "euthymic" (normal), and suggested "only minimal psychiatric symptoms." (T. 171, 542). The second instance was a prescription management visit on April 7, 2011 at which Dr. Raju observed Tim as being "calm, cooperative, [and] pleasant" and that "[h]er mood is good." (T. 171, 545). He also recorded that Tim's "affect is full, appropriate and stable. She denies auditory or visual hallucinations. She denies suicidal or homicidal ideation at this time. Her judgment and insight are fair. She has adequate impulse control." (*Id.*).

ALJ Greener's reasoning might be defensible were all of Dr. Raju's treatment records of similar effect or if these instances were the only observations. ALJ Greener's deduction, however, ignores all other therapy sessions under Dr. Raju's care wherein Tim's mood and affect were noted to be "depressed," "flat," "anxious," "angry," "restricted," or "sad." (T. 138, 140, 143, 145, 149, 153, 157, 459, 461, 463, 465, 467, 471, 472, 476, 478, 547, 609, 611, 613, 615, 617, 620,

---

[17] ALJ Greener mistakenly refers to this as an office visit, when it actually is a therapist's progress note. (T. 171, 542).

624). On July 7, 2011, for example, Dr. Raju noted that Tim was "hearing voices," "has visual hallucinations," and "some auditory hallucinations." (T. 622). In effect, ALJ Greener cherry-picked evidence from Dr. Raju's treatment records. She discredited Dr. Raju's opinions regarding mental limitations based on only two isolated instances where Dr. Raju's records failed to note marked psychiatric symptoms, while ignoring all the other instances where serious symptoms were documented.

It is axiomatic that a full and fair hearing in accordance with beneficent purposes of the Social Security Act requires consideration of all relevant evidence. *See Echevarria*, 685 F.2d at 755 (a reviewing court must determine whether the administrative law judge adequately protected the claimant's rights by ensuring that all of the relevant facts were sufficiently developed and considered). Thus, while administrative law judges are entitled to resolve conflicts in the evidentiary record, they cannot pick and choose only evidence that supports their particular conclusions. *See Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing *Fiorello v. Heckler*, 725 F.2d 174, 175-76 (2d Cir. 1983)). In other words, an administrative law judge may not "cherry-pick" medical opinions that support his or her opinion while ignoring opinions that do not. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). The rationale for this proscription is especially apparent with regard to conflicting substantive detail from the same evidentiary source such as Dr. Raju.

Dr. Raju's clinical findings, when considered as a whole, clearly support his assessment that Tim has marked mental limitations in four activities, and that such limitations produce a substantial loss of ability to function in those work-related areas. ALJ Greener's cherry-picking disregards the clear weight of Dr. Raju's treatment notes. As such, a reviewing court cannot conclude that

he showed good cause for refusing to afford controlling weight to opinions of Tim's treating source.

Failure to articulate a good reason for discrediting treating source opinion might be viewed as a technical and non-reversible error if the record were to reflect other good reasons. If there were such, ALJ Greener did not express them, nor are any immediately obvious. Dr. Sirotenko's neurologic examination disclosed no evidence of psychiatric impairment, but it is absurd to suggest that an osteopath's "mini mental status" report based on a one-time examination focused on headaches would outweigh a treating psychiatrist's longitudinal diagnoses of mental impairments and their limiting effects. And, as noted earlier, ALJ Greener did not expressly assign any weight to Dr. Sirotenko's opinion.

The State Agency psychological consultant, J. Dombrocia, opined that Tim has no mental limitations in certain functional areas and only moderate (as opposed to marked) limitations in others. Assuming proper professional licenses and academic credentials, J. Dombrocia is considered a highly qualified expert in Social Security disability evaluation. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). Generally, however, opinions of a nonexamining, consultative source are entitled to less weight than that of treating source opinions. *See* 20 C.F.R. §§ 404.1527(c)(1). 416.927(c)(1). While they can override treating source opinions, they cannot do so in a vacuum. There must be a good reason beyond than the consultant offers a "medical opinion.*" See Diaz v. Shalala*, 59 F.3d 307, 313 n. 5 (2d Cir. 1995) ("[T]he opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record."); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).

The only reason articulated by ALJ Greener was that J. Dombrocia's opinions were supported by "mental status examinations in the record." These mental status examinations, apparently, are the same two instances relied on by ALJ Greener to discount opinions of treating psychiatrist Dr. Raju. Based on the earlier cherry-picking analysis, this cannot constitute a good reason.

Accordingly, Tim's first point (arguing that ALJ Greener erred when failing to afford controlling weight to Dr. Raju's opinions regarding mental limitations) has merit and should be sustained. ALJ Greener failed to provide a full and fair hearing when ignoring same-source evidence from Dr. Raju that did not support her conclusions. Reliance on cherry-picked evidence does not satisfy a substantial evidence standard. *See Fiorello*, 725 F.2d at 175-76.

2. <u>Prejudice</u>

This error, however, is of academic interest only if harmless, *i.e.*, it did not affect a substantial right. Such a determination is not warranted here.

Both the Administrative Procedure Act and the Social Security Act give proponents of administrative actions statutory rights to orders supported by substantial evidence. *See* 5 U.S.C. § 706(d); 42 U.S.C. § 405(g). The Constitution condemns arbitrary and capricious exercise of government power, and, for over a century, American jurisprudence has recognized that administrative fiats not fairly supported by evidence are arbitrary and baseless. *Interstate Commerce Comm'n v. Louisville & Nashville R.R. Co.*, 227 U.S. 88, 91 (1913); *see also Rice v. Shalala*, No. 93-1305, 1 F.3d 1234 (Table), 1993 WL 309631, at *5 n.6 (4th Cir. Aug. 16, 1993) (acknowledging that substantive due process rights are implicated when Commissioner's decision not supported by substantial

evidence). Thus, broadly viewed, adverse administrative decisions unsupported by substantial evidence always affect substantial rights.

In this instance, moreover, a substantial right was affected more directly. Without a good reason for discrediting Dr. Raju's opinions, ALJ Greener was obliged to give them controlling weight. That would result in a finding of marked limitations (substantial loss of ability to function) in four work-related functional areas: (1) interacting appropriately with the public; (2) interacting appropriately with supervisors; (3) interacting appropriately with coworkers; and (4) responding appropriately to usual work situations and to changes in a routine work setting.[18]

Such findings almost certainly would have precipitated a decision of "disabled." The Commissioner instructs administrative adjudicators as follows:

> The basic mental demands of competitive, remunerative, *unskilled work* include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. *A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.*

SSR 85-15, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL

---

[18] Even if there were a good reason to not afford Dr. Raju's opinions controlling weight, it seems probable, if not inevitable, that Dr. Raju's opinions would be entitled to great weight, or at least greater weight than other medical opinions regarding mental limitations, upon a faithful application of the six-factor analysis prescribed by regulation. *See* n. 16, *supra.*

IMPAIRMENTS, 1985 WL 56857, at *4 (SSA 1985) (emphasis added). This Ruling applies specifically to Step 5 determinations. Thus, had ALJ Greener accepted Dr. Raju's opinions, she could not have come to her Step 5 finding that Tim can perform alternative available unskilled work.

This also illuminates a likely change in ALJ Greener's Step 4 determination that Tim can perform her past relevant work as a thermostat assembler and circuit board solderer. First, had Dr. Raju's opinions been credited, ALJ Greener's residual functional capacity finding likely would have changed to far more restrictive mental limitations that would restrict Tim to only unskilled work. Second, if the occupational base for a person who has a mental impairment which causes a substantial loss of ability to respond appropriately to supervision, coworkers and usual work situations, is completely eroded with respect to even unskilled work (as stated in SSR 85-15), it is similarly eroded with respect to more demanding semi-skilled work required of thermostat assemblers and circuit board solderers. *See* 20 C.F.R. §§ 404.1545(c), 416.945(c) ("A limited ability to carry out certain mental activities, such as limitations in . . .responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work."). Severe mental limitations cut across exertional and skill categories, but, generally, the higher the skill level required by a job, the more difficult it is to perform by a mentally-impaired worker. *See generally* SSR-85-15, 1985 WL 56857.

In sum, a reviewing court cannot confidently conclude that the case would have been decided the same way notwithstanding the error. The error, therefore, is not harmless.

3. <u>Conclusion</u>

The foregoing analysis of Tim's first point of error identifies a legal error that affected a substantial right. Accordingly, the Commissioner's decision should be reversed.

## VI. Remaining Points of Error

Since remand is necessary based on the error discussed above, it is unnecessary to address Tim's remaining points relating to ALJ Greener's failure to develop the record, failure to find her migraines/cervicogenic headaches constitute a medically determinable severe impairment at Step 2, whether substantial evidence supports her physical residual functional capacity assessment, credibility assessment of subjective testimony, and her "framework" application of the grids.

Without expressing an opinion as to whether any of these additional points ultimately might be sustained when adjudicated on their merits, the undersigned observes that none is patently frivolous. Accordingly, upon remand the Commissioner should consider them, as well as other arguments proffered under Tim's first point of error but not addressed in this report, when making a new determination.

## VII. Recommendation

The Commissioner's decision denying disability benefits should be REVERSED and the case REMANDED pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings.

## VIII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the   31   day of   January   2014.

*Earl S. Hines* (signature)

Earl S. Hines
United States Magistrate Judge